```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
ROSALIE OAKLEY,                       :
                                      :
              Plaintiff,              :     10 Civ. 7739 (JSR)
                                      :
         -v-                          :     MEMORANDUM ORDER
                                      :
FEDERATION EMPLOYMENT AND GUIDANCE    :
SERVICES, INC., STUART OLTCHICK,      :
YOLANDA L. ROBANO-GROSS, ANDREW       :
COHEN, PETER CHAFFE, SHARON TAYLOR,   :
DAL MARIE JONES, DONNA LIMITI, SHEILA :
GREEN-GHOLSON,                        :
                                      :
              Defendants.             :
------------------------------------- x
```


JED S. RAKOFF, U.S.D.J.

Plaintiff Rosalie Oakley, who is mentally retarded, blind, and mobility impaired, has brought suit against those she claims bear responsibility for burns she suffered on September 1, 2010. Defendants include Federation Employment and Guidance Services, Inc. ("FEGS"), three FEGS policy-level officers - Stuart Oltchick, Yolanda Robano-Gross, and Andrew Cohen — Donna Limiti, the Director of the Brooklyn Developmental Disabilities Service Office ("BDDSO"), Sheila Green-Gholson, the Deputy Director of the BDSSO, and Peter Chaffe, Sharon Taylor, and Dal Marie Jones, who worked at the FEGS-operated facility where Oakley resided.[1] On February 14, 2011, the Court dismissed Oakley's claims under the Americans with

---

[1] Oakley has subsequently dismissed all of her claims against Deputy Director Green-Gholson. See Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment dated September 28, 2011 at 24 n.9. Accordingly, the Court will not consider those claims and directs the Clerk of the Court to enter final judgment with respect to Ms. Green-Gholson.

Disabilities Act and the Rehabilitation Act, but allowed her claims under 42 U.S.C. § 1983 and New York State common law to proceed.

On August 16, 30, and 31, 2011, the defendants separately moved for summary judgment on Oakley's remaining claims. On November 15, 2011, the Court issued a "bottom-line" order granting the defendants' motions on all of Oakley's claims under § 1983 and on Oakley's claims for negligence against Oltchick, Robano-Gross, and Cohen. The Court denied the motions for summary judgment on Oakley's negligence claims against FEGS, Chaffe, Taylor, and Jones. This Memorandum explains the reasons for the Court's bottom-line order and also corrects an oversight in that order. Specifically, the Court should not have granted summary judgment on Oakley's claims for negligence against defendant Cohen. Because this Memorandum reinstates the claims for negligence against Cohen, Cohen will be a defendant at trial. The Court clarifies that trial will proceed on the Fourth, Fifth, and Sixth Claims for Relief in Oakley's complaint, which survive against FEGS, Cohen, Chaffe, Taylor, and Jones.

The pertinent facts presented at summary judgment, undisputed except where indicated, are as follows.[2] At all relevant times,

---

[2] Unless otherwise indicated, citations refer to both parties' Rule 56.1 statements. Because different groups of defendants submitted separate Rule 56.1 statements, citations to a particular Rule 56.1 statement refer only to that statement and Oakley's response. Because Oakley did not respond to the separate Rule 56.1 Statement of defendant Limiti, she has effectively admitted the facts Limiti presented. See Gianullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails

Rosalie Oakley resided at a FEGS-operated Individualized Residential Alternative (hereinafter, the "Brighton House"). FEGS Defendants' Statement Pursuant to Local Civil Rule 56.1 ¶ 4. In 1992, she had an IQ of less than 20 and was severely visually impaired. Id. ¶ 6. Because Oakley had previously resided in the Willowbrook Developmental Center, she is a member of the Willowbrook class, and the injunction that governs relations between the State of New York and that class applies to Oakley. Plaintiff's Combined Local Civil Rule 56.1 Counter-Statement of Material Facts as to All Defendants ¶ 2. The Willowbrook Injunction gives Oakley a lifelong right to receive community residential placement that protects her personal safety. Id. ¶ 13. The Willowbrook class and the state are the only parties to the Willowbrook injunction, id. ¶ 15, and the BDSSO is ultimately responsible for ensuring that Oakley receives the services to which the injunction entitles her. Id. ¶ 10.

On the evening of September 1, 2010, while residing at the Brighton House, Oakley soiled herself. FEGS Defendants' Statement Pursuant to Local Civil Rule 56.1 ¶ 45. Since defendant Dal Marie Jones was the only female Direct Care Worker at Brighton House at the time, she undertook to clean Oakley and change her diaper. Id. ¶ 46.[3] While Jones was cleaning Oakley, she noticed that the skin

---

to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").
3 While FEGS acknowledges that Jones cleaned Oakley, Jones may deny it.

between Oakley's legs was peeling off. Id. ¶ 47. No such peeling had appeared earlier that same evening. Id. ¶ 42. Another FEGS employee advised Jones to call the nurse on duty, Sharon Taylor, and Jones did so at approximately 11:27 PM. Id. ¶¶ 48-49. In response to reports from Jones, Nurse Taylor concluded that Oakley suffered from a rash that did not require immediate medical attention, and that they could get Oakley appropriate care the next morning. Id. ¶¶ 50-51. Oakley's expert, Nurse Rosalie M. Yazbeck, has opined that Nurse Taylor departed from professional standards by relying on the assessment of Jones, who was not a licensed medical professional, instead of directly assessing of Oakley's condition. Declaration of Jonathan Bauer dated September 28, 2011 Ex. 50.

On the morning of September 2, 2010, Jones found that Oakley's injury had worsened. FEGS Defendants' Statement Pursuant to Local Civil Rule 56.1 ¶ 55. Several FEGS employees loaded Oakley into a FEGS vehicle to transport her to another location for medical care. Id. ¶ 56. Nonetheless, someone directed the van to return to Brighton House. Id. After the van returned to Brighton House,

---

See Jones's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ¶ 19 ("Jones did not shower Oakley."). Jones does not clarify whether she denies cleaning Oakley at all, or whether she merely denies showering Oakley rather than bathing her. Nonetheless, Oakley has produced enough evidence to allow a reasonable jury to find that Jones showered her. See Declaration of Jonahthan Bauer dated September 28, 2011 Ex. 35 (incident report in which Jones states, "while I was showering Rosalie [Oakley] I noticed that the skin between her legs was peeling").

Nurse Taylor observed Oakley's injury and concluded that Oakley had sustained burns to her legs. Id. ¶ 57. After Nurse Taylor made this determination, several FEGS employees, including Chaffe, transported Oakley to Lutheran Medical Center, where hospital employees determined that Oakley had suffered a burn. Id. ¶ 58.

State regulation requires water temperatures at Brighton House and other mental health facilities not to exceed 110°F. Id. ¶ 71. FEGS installed a mixing valve and hot water cut-off in order to ensure that water temperatures complied with state regulations, id., and no incident involving hot water had occurred in the five years preceding September 1, 2010. Id. ¶ 85. Moreover, the logbook in which FEGS employees presumably recorded water temperatures reports almost uniform findings that, during the relevant period, the water temperature was 110°F. See Amended Decl. of Adam R. Goldsmith dated August 29, 2011 Ex. R. Nonetheless, Oakley has produced evidence that FEGS's system, as installed, would not have prevented water temperatures from exceeding 110°F. See Decl. of Jonathan Bauer dated September 28, 2011 Ex. 18 ("Garside Depo.") at 110:5-111:22. In fact, during previous inspections of Brighton House in 2007 and 2008, inspectors noted that water temperatures had reached 123°F and 131°F, respectively. FEGS Defendants' Statement Pursuant to Local Civil Rule 56.1 ¶¶ 75-76.

With respect to the individual defendants, at the time of the accident Oltchick was simply a volunteer in his role as the President of FEGS's board of directors.  Id. ¶ 9.  He had no responsibility for managing FEGS programs, had never been to Brighton House, and had never seen the water temperature logbook. Id. ¶¶ 9-10.

Robano-Gross, as a vice president at FEGS, oversaw the operations of residential programs within the developmental disabilities services division, but she did not monitor the specific, day-to-day operations of Brighton House, and she had not seen the temperature logbook.  Id. ¶¶ 11-13.

Cohen was responsible for ensuring that the residential sites were in compliance with regulations, but he had no day to day management responsibilities at the Brighton House and had never seen the water temperature logbook for Brighton House.  Id. ¶ 14. Nonetheless, Oakley has produced evidence that Cohen was responsible for "[d]irect[ing] and monitor[ing] all facility operations to ensure adherence to all agency and related policies" and for "[e]nsuring the maintenance and up-keep of residential sites in accord with health and safety standards."  Decl. of Jonathan Bauer dated September 28, 2011 Ex. 37.

Chaffe managed the Brighton House and oversaw its daily operations.  FEGS Defendants' Statement Pursuant to Local Civil Rule 56.1 ¶ 15.  On both August 9 and August 29, 2010, Chaffe

requested that FEGS's facility management department fix the shower at Brighton House. Id. ¶¶ 86, 88.

Limiti is the chief administrative officer of the BDDSO, supervising over a thousand employees. Statement of Material Facts in Support of Defendants Limiti and Green-Gholson's Motion for Summary Judgment Pursuant to Local Rule 56.1 ¶ 5. Even though the BDDSO is ultimately responsible for ensuring that Oakley receives the services to which the Willowbrook Injunction entitles her, Limiti neither provides direct care to individuals with developmental disabilities, nor trains those who do, nor oversees inspections of facilities in which such care occurs. Id. ¶¶ 9-11. In fact, the person tasked with ensuring that the BDSSO provided Oakley with the services to which Willowbrook Injunction entitled her is several levels down the administrative hierarchy from Limiti. Id. ¶¶ 37-38.

Under Federal Rule of Civil Procedure 56(a), a party requesting summary judgment must demonstrate that there is "no genuine dispute as to any material fact" and that she is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

7

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." The Second Circuit has held that "the actions of a nominally private entity" qualify as actions "under color of" State law under § 1983 when:

> (1) the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies (the "joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the [s]tate, ("the public function test").

Sybalski v. Independent Group Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (internal quotation marks omitted). Oakley does not argue that the State required FEGS or its employees to take any of the actions at issue in this case, so the "compulsion test" does not apply. Similarly, the State neither traditionally nor exclusively performed the function of caring for the mentally disabled, so Oakley cannot satisfy the "public function test." Sybalski, 546 F.3d at 259-60. Thus, Oakley must establish that defendants qualified as state actors under the "joint action test."

To satisfy the joint action test, a plaintiff cannot merely allege that the State provides "substantial funding of the

8

activities of a private entity." Blum v. Yaretsky, 457 U.S. 991, 1011 (1982). Neither can a plaintiff argue simply that the State regulates the private action. Id. at 1004. Rather, private action must be "so governed by state regulation as to be properly attributed to the state." Sybalski, 546 F.3d at 258 (citation omitted). Moreover, the plaintiff must prove that the state was involved "with the activity that caused the injury giving rise to the action." Id. (quoting Schlein v. Milford Hosp., Inc., 561 F.2d 427, 428 (2d Cir. 1977)).

In its decision on the defendants' motions to dismiss, the Court held that FEGS's assumption of the State's duties under the Willowbrook Injunction, among other allegations, rendered Oakley's claim that FEGS qualified as a state actor under the joint action test sufficiently plausible to continue to discovery. This holding, however, did not entail that the Willowbrook Injunction necessarily transformed FEGS into a state actor. Indeed, in Sybalski, the Second Circuit held that a mental health facility was not a state actor under the joint action test even though the State had established "substantive rights for patients in mental health facilities and procedures for protecting these rights." 546 F.3d at 258-59. Thus, even though New York law required mental health facilities to permit patients to receive visitors at reasonable times, a mental health facility that allegedly violated this requirement did not qualify as a state actor. Id.

In its Memorandum on the motion to dismiss, the Court did not rely solely on the Willowbrook Injunction. Instead, it also noted that Oakley alleged that staff from the BDDSO participated extensively in making decisions about Oakley's care. Oakley's continued reliance on the Willowbrook Injunction, then, is misplaced in the absence of evidence that the State's oversight of FEGS's compliance with that injunction rendered "the activity that caused the injury" attributable to the State.[4] The undisputed evidence, however, shows that the State does not regulate mental health facilities containing Willowbrook class members more extensively than it does other mental health facilities. Indeed, the "Medicaid Service Coordination Vendor Contract" between FEGS and the State makes only sparing reference to Willowbrook class members, and Oakley does not argue that any such reference

---

[4] At times, Oakley appears to argue that violations of the Willowbrook Injunction would give rise to a § 1983 action. See Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment dated September 28, 2011 at 12 ("Ms. Oakley invoked 42 USC § 1983 because the State is obligated to provide her with residential and other care and services in a manner that will ensure her safety pursuant to the Willowbrook Permanent Injunction."). According to Oakley's logic, since only the State has obligations under the Willowbrook Injunction, any violation of that injunction is effectively attributable to the State. This argument fails, however, because Oakley could not bring a § 1983 action to enforce the Willowbrook Injunction, not even against the State itself. See Batista v. Rodriguez, 702 F.2d 393, 398 (2d Cir. 1983) ("The remedy for breach of the Barros agreement is a suit for breach of contract or enforcement of the decree through judicial sanctions, including contempt, not an action under § 1983."); see also 42 U.S.C. § 1983 (creating a cause of action based on "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" (emphasis added)). Thus, even if FEGS failed to discharge the State's obligations under the Willowbrook Injunction, that failure alone would not support a § 1983 claim, but would instead give rise to a suit to enforce the injunction.

10

constrained FEGS's discretion in any way relevant to this case. See Decl. of Jonathan Bauer dated September 28, 2011 Ex. 14. Moreover, the procedures for inspecting mental health facilities containing Willowbrook class members are virtually identical to those that do not contain such members, and Oakley, once again, does not argue that any difference between these procedures relevantly affected FEGS's actions. Compare Decl. of Adam R. Goldsmith dated August 29, 2011 Ex. LL, with id. Ex. MM; see also FEGS Defendants' Statement Pursuant to Local Civil Rule 56.1 ¶¶ 73-74 (noting that the parties do not dispute that these forms' accuracy).

In the absence of any evidence that the State, rather than merely imposing substantive regulatory requirements, meaningfully participated in "the activity that caused the injury giving rise to the action," the logic that Sybalski applied to mental health facilities must govern this case. In Sybalski, while State law gave patients at mental health facilities a right to receive visitors and "established procedures governing the limitations" facilities could place on that right, "the administrators of those facilities ma[d]e the decision about whether such limitations should be imposed," and thus that decision did not qualify as State action. 546 F.3d at 259. Here, almost identically, while State regulations required water temperatures not to exceed 110°F and provided procedures, such as inspections, for ensuring that FEGS

11

met that requirement, FEGS chose and oversaw the system by which it attempted to comply with those regulations, and the failure of that system was attributable to FEGS rather than to the State.[5] Accordingly, no reasonable jury could conclude that either FEGS or its policy-level employees - i.e., Oltchick, Robano-Gross, and Cohen - acted "under color of" State law, and the Court must grant these defendants' motion for summary judgment on Oakley's § 1983 claims against them.

The same logic applies to the § 1983 claims against those FEGS employees who provided direct care to Oakley, namely, Chaffe, Taylor, and Jones. While Oakley argues that the State relied on the direct services of Chaffe, Taylor, and Jones in order to meet its obligations under the Willowbrook Injunction, she once again provides no evidence that the State so extensively regulated the care these defendants provided that the Court can attribute the actions that caused the injury to the State.[6] Thus, no reasonable jury could conclude that Chaffe, Taylor, and Jones acted under color of state law, and the Court must grant these defendants'

---

[5] Oakley appears to focus her arguments on FEGS's hot water system. Nonetheless, to the extent she bases her § 1983 claims on FEGS's training or supervision of its employees who provided direct care, she has also failed to produce evidence showing that the State so thoroughly regulated this training and supervision that any deficiency was attributable to the State.

[6] As noted above, see supra note 4, Oakley cannot sue under § 1983 for violation of the Willowbrook Injunction, and must instead show that the State regulated the provision of services so extensively that the alleged violations of Oakley's legal rights are attributable to it.

motions for summary judgment on Oakley's § 1983 claims against them.

Limiti is entitled to summary judgment on Oakley's § 1983 claim for a different reason. While Limiti, by virtue of her position, likely undertook any relevant action under color of state law, Oakley has not submitted any evidence that could meet the requirement that she show that Limiti was personally involved in the actions of which she complains. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (requiring, under § 1983, a plaintiff to show that defendants were personally involved in alleged constitutional deprivations). The Second Circuit has held that plaintiffs can establish "personal involvement" by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Id.[7] Oakley does not allege that Limiti "participated directly" in the alleged violations, "failed to remedy the wrong," "created a policy or custom under which unconstitutional practices occurred,"

---

[7] Limiti argues that Ashcroft v. Iqbal, 556 U.S. 662 (2009) precludes Oakley from relying on some of the theories of personal involvement advanced in Colon. Nonetheless, because the Court finds that Oakley's § 1983 claim cannot succeed even under the test in Colon, it need not consider what additional effect Iqbal would have on those claims.

13

or failed to "act on information" about unconstitutional acts. Instead, she appears to argue that Limiti was "grossly negligent" because inspectors from the BDSSO failed to test the water temperature at every spout in Brighton House. Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment at 25. Nonetheless, the facts set forth by Limiti, which Oakley failed to dispute, reveal that Limiti is not personally responsible for overseeing inspections of Brighton House and ensuring that they conform to the requirements of state law. Because Limiti had no duty to ensure that BDSSO inspectors tested the water temperature at every spout, and thus could not breach such a duty, Oakley has failed to prove that she was negligent, much less that she was grossly negligent. Accordingly, no reasonable jury could conclude that Limiti was personally involved in the actions of which Oakley complains, and the Court must grant Limiti's motion for summary judgment on Oakley's § 1983 claim.

Having granted summary judgment on all of Oakley's § 1983 claims, the Court now turns to her claims that FEGS, Oltchick, Robano-Gross, Cohen, Chaffe, Taylor, and Jones acted negligently under New York State common law. With respect to these claims, the defendants argue that Oakley has failed to produce evidence of proximate cause, i.e., that "defendants' negligent act[s] or omission[s were] a substantial factor in bringing about [Oakley's] injuries." Capicchioni v. Morrissey, 613 N.Y.S.2d 499, 500 (3d

14

Dep't 1994). This argument is persuasive with respect to Oltchick and Robano-Gross. As noted above, the undisputed facts establish that neither Oltchick nor Robano-Gross had any responsibility for overseeing the daily operations of Brighton House, much less for ensuring that the Brighton House's system for regulating water temperatures functioned properly. In the absence of such a responsibility, Oakley cannot prove, and no reasonable jury could find, that these defendants' negligence, rather than the negligence of those who allegedly failed to properly install, inspect, and maintain the hot-water system, was a "substantial factor" in causing her injuries. Accordingly, the Court grants summary judgment in favor of Oltchick and Robano-Gross on Oakley's negligence claims.

Nonetheless, this same logic does not apply to Cohen, Chaffe, Taylor, and Jones. With respect to Cohen, Oakley has produced evidence that he was responsible for "[d]irect[ing] and monitor[ing] all facility operations to ensure adherence to all agency and related policies" and "[e]nsuring the maintenance and up-keep of residential sites in accord with health and safety standards." Decl. of Jonathan Bauer dated September 28, 2011 Ex. 37. A jury that concluded that Cohen negligently failed to discharge these responsibilities by disregarding the maintenance of Brighton House's hot-water system could also conclude that Cohen's

15

negligence was a "substantial factor" in causing Oakley's burns.[8] Chaffe, who managed the Brighton House and oversaw its daily operations, bore even greater responsibility for ensuring the maintenance of Brighton House's hot-water system. In fact, in the month preceding the incident, he twice requested that FEGS's facility management department fix the shower at Brighton House. If a jury concluded that Chaffe had been negligent in his approach to the shower, or to the hot-water system generally, it could reasonably conclude that Chaffe's negligence proximately caused Oakley's burns.

With respect to Taylor, Oakley has produced evidence that Taylor's advice delayed treatment of Oakley's injuries and that the delay in treatment exacerbated those injuries. A jury that concluded that Taylor departed from professional standards when she provided the relevant advice could reasonably conclude that Taylor's negligence was a substantial factor in causing the

---

[8] Oakley has produced evidence from which a reasonable jury could conclude that Cohen failed to maintain Brighton House's system for regulating water temperature. First, Oakley has provided evidence that that system, as installed, might not have prevented water temperatures from exceeding 110°F. See Decl. of Jonathan Bauer dated September 28, 2011 Ex. 18 ("Garside Depo.") at 110:5-111:22. In fact, during previous inspections of Brighton House in 2007 and 2008, inspectors found that the water temperature had reached 123°F and 131°F, respectively. FEGS Defendants' Statement Pursuant to Local Civil Rule 56.1 ¶¶ 75-76. Moreover, the logbook in which FEGS employees presumably recorded water temperatures reports almost uniform findings that, during the relevant period, the water temperature was exactly 110°F. See Amended Decl. of Adam R. Goldsmith dated August 29, 2011 Ex. R. A jury could reasonably conclude that Cohen should have reviewed this logbook in discharging his duties and that, had he done so, he would have become suspicious of Brighton House's monitoring efforts.

additional injury that resulted from the delay in treatment.[9] Finally, because Oakley has produced evidence that Jones administered the cleaning that allegedly burned Oakley,[10] a jury could find that any negligence on the part of Jones directly caused Oakley's injuries. Accordingly, the Court denies these defendants' motions for summary judgment on Oakley's negligence claims. Since a jury could conclude that the negligence of multiple FEGS employees proximately caused Oakley's injuries, it could also find FEGS liable on a theory of respondeat superior. Bing v. Thunig, 2 N.Y.2d 656, 666-67 (1957).[11] Thus, the Court denies FEGS's motion for summary judgment on Oakley's negligence claims.

Finally, the remaining defendants argue that, because the Court has granted summary judgment on or dismissed all of Oakley's federal claims, the Court should remand the remainder of this case to state court. 28 U.S.C. § 1367(c) provides that a district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has

---

[9] Oakley's expert, Nurse Rosalie M. Yazbeck, has opined that Nurse Taylor departed from professional standards by relying on the assessment of Jones, who was not a licensed medical professional, instead of directly assessing of Oakley's condition. Declaration of Jonathan Bauer dated September 28, 2011 Ex. 50.
[10] See Declaration of Jonahthan Bauer dated September 28, 2011 Ex. 35 (incident report in which Jones states, "while I was showering Rosalie [Oakley] I noticed that the skin between her legs was peeling").
[11] Jones appears to argue that the doctrine of respondeat superior prevents Oakley from bringing a negligence claim against Jones because such a claim can proceed against FEGS, Jones's employer. Nonetheless, in the absence of support for this interpretation of the doctrine, the Court finds that Oakley can bring claims against both employer and employee.

17

original jurisdiction" (emphasis added). Once a court's discretion is triggered, "the exercise of discretion 'is informed by whether remanding the pendent state claims comports with the underlying objective of most sensibly accommodat[ing] the values of economy, convenience, fairness, and comity.'" Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 445 (2d Cir. 1998) (quoting Executive Software N. Am., Inc. v. U.S. Dist. Court, 24 F.3d 1545, 1557 (9th Cir. 1994)). Here, retaining the case will best promote the values of economy and convenience. The Court is familiar with the underlying facts and can bring the case to trial more quickly than could a court without such familiarity. Accordingly, the Court denies the remaining defendants' request for remand to state court.

In sum, the Court grants the defendants' motions for summary judgment on Oakley's § 1983 claims and on Oakley's state law negligence claims against defendants Oltchick and Robano-Gross. In contrast, the Court denies the defendants' motions for summary judgment on Oakley's negligence claims against FEGS, Cohen, Chaffe, Taylor, and Jones. The Clerk of the Court is directed to enter final judgment with respect to defendants Oltchick, Robano-Gross, Limiti, and Green-Gholson. The remaining parties are ordered to continue preparing for the trial scheduled to begin at 9 A.M. on April 23, 2012.

SO ORDERED.

18

```
                                              _____
                                              JED S. RAKOFF, U.S.D.J.
Dated: New York, New York
       January 3, 2012
```